# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SEANPAUL REYES,
      *Plaintiff*,

     v.

CHARLES LAVOIE and BRYAN J. FAHEY,

     *Defendants*.

No. 3:24-cv-01174-MPS

## RULING ON MOTION TO DISMISS

To preserve the ability of police officers to protect the public without fear of ruinous liability and to avoid deterring talented candidates from entering public service, the Supreme Court has created a powerful shield for police officers accused of violating an individual's constitutional rights: qualified immunity. The shield of qualified immunity protects a police officer even when the officer violates an individual's constitutional right unless that right was "clearly established," i.e., recognized by the Supreme Court or the relevant Court of Appeals in a case in which the officer was confronted with similar factual circumstances. The idea is that before a court may hold the officer liable, the law must be so well-defined in prior cases presenting situations like those confronting the officer that it would have been obvious to any reasonable officer—not merely to a lawyer or a judge—that what the officer did violated the Constitution.

To rule on the motion to dismiss filed by the two Defendant police officers in this case, I must decide whether qualified immunity protects each of them from Plaintiff SeanPaul Reyes's First Amendment claim in two different factual contexts: (1) when Connecticut State Trooper Charles Lavoie stopped Reyes from video-recording the TSA screening area inside Bradley International Airport; and (2) when Connecticut State Police Sergeant Bryan Fahey stopped Reyes

1

from video-recording outside the State Police headquarters. After reviewing the case law, I conclude that qualified immunity protects Lavoie, because any First Amendment right to film TSA security-screening areas within airports was not clearly established at the time, but not Fahey, because the First Amendment right to film a police station from outside the building was. With respect to Lavoie, I add two points: First, I do not decide, and my decision does not depend on, whether Reyes had a First Amendment right to video-record TSA officials working at the security screening area in the airport. Instead, I decide only that, if he had such a right, that right was not "clearly established" under governing case law at the time of the events in this case. Second, I do not address Reyes's Fourth Amendment claims against Lavoie, which would permit him to collect the same damages (at least) as his First Amendment claim, because the Defendants have not moved to dismiss that claim.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

The following factual allegations are drawn from Reyes's complaint, ECF No. 1, and I accept them as true for the purpose of this motion.

Plaintiff SeanPaul Reyes describes himself as an independent journalist and "First Amendment auditor." ECF No. 1 ¶¶ 11–12. In this role, he makes video recordings of his interactions with public officials and posts them to his YouTube channel, Long Island Audit. *Id.* ¶ 11.

On July 23, 2021, Reyes began filming a video for his channel at Bradley Airport in Windsor Locks, Connecticut. *Id.* ¶ 15–16. The airport is owned and operated by the Connecticut Airport Authority, a "quasi-public agency." *Id.* ¶ 16. He initially focused his camera on the area

in and around the TSA checkpoint, which is inside the airport building. *Id.* ¶ 17. Before going to the airport, Reyes checked the TSA website, where he found the following statement:

> TSA does not prohibit photographing, videotaping or filming at security checkpoints, as long as the screening process is not interfered with or sensitive information is not revealed. Interference with screening includes but is not limited to holding a recording device up to the face of a TSA officer so that the officer is unable to see or move, refusing to assume the proper stance during screening, blocking the movement of others through the checkpoint or refusing to submit a recording device for screening. Additionally, you may not film or take pictures of equipment monitors that are shielded from public view

*Id.* ¶ 18. Reyes alleges that he adhered to the policy as "he did not interfere with the screening process or reveal sensitive information as is described by the policy." *Id.* ¶ 20.

Soon after he had begun filming, two TSA officers approached Reyes and asked why he was recording. *Id.* ¶¶ 21–22. Reyes did not respond except to say that he was "just recording" because he was "interested." *Id.* One of those officers asserted several times that Reyes was not allowed to record, told him to stop, and asked what purpose Reyes had for recording. *Id.* ¶¶ 22–28. Reyes asserted that he would not stop recording and declined to answer the officer's questions except to say that he was "working on a story." *Id.* ¶¶ 24-26, 28. This officer then left to fetch her supervisor. *Id.* ¶ 28. Reyes then approached a third TSA officer, who identified himself as a supervisor. *Id.* ¶ 29. The supervisor stated that Reyes was "within his rights" in filming the TSA checkpoint. *Id.*

At this point, Connecticut State Police Trooper Lavoie approached Reyes and inquired as to his business at the airport. *Id.* ¶ 30. Reyes replied that he was gathering information for a story as an independent journalist. *Id.* ¶ 31. Lavoie then asked Reyes several times for his ID, stating that Reyes was "causing alarm" at the airport and that "multiple people" had asked the police what Reyes was doing. *Id.* ¶¶ 32–34.

Reyes declined to provide his ID, stating that he was not required to by law, and a TSA supervisor had told him that he was within his rights to film.  *Id.* ¶ 32–33, 35.  Lavoie then placed Reyes in handcuffs, took Reyes's phone, and ended the recording.  *Id.* ¶¶ 36–37.  After being handcuffed, Reyes said he had no ID on him, that he was an independent journalist, and that he was willing to provide Lavoie his name and date of birth.  *Id.* ¶ 38.

Lavoie radioed that he had detained Reyes for failure to show ID, told Reyes that he was not under arrest, and performed a pat down.  *Id.* ¶¶ 39–40.  Reyes asked why he was detained, and Lavoie stated that it was for "interfering with my investigation" and "causing a disturbance at the airport."  *Id.* ¶ 41.  Reyes and Lavoie then engaged in a back-and-forth about Reyes's rights and his purpose for being at the airport.  *Id.* ¶¶ 40–54.  Lavoie asked several questions about Reyes's identity and purpose at the airport.  *Id.* ¶¶ 46, 48–50.  Reyes stated that his rights had been violated, invoked his Fifth Amendment right to stay silent, asked to have his handcuffs removed and to speak with Lavoie's supervisor, and asserted several times that he was an independent journalist gathering news for a story.  *Id.* ¶¶ 40, 43–46, 48, 50, 52.  Reyes reiterated that a TSA supervisor had informed him he was allowed to record the security checkpoint, and Lavoie reiterated that Reyes had been "causing alarm and disturbance to the passengers."  *Id.* ¶ 53.

Sergeant Drummond, presumably also of the Connecticut State Police, then approached Reyes and Lavoie.  *Id.* ¶ 55.  Lavoie informed Drummond: "Multiple people came up to me, including TSA, saying that this guy was acting very suspicious at the checkpoint.  I observed him recording, which is nothing wrong with that, however, when I went to identify him to find out what his business is at the airport, he refused to comply.  He wouldn't provide me with any ID . . . . [P]eople were just alarmed and disturbed about what he was doing so I wanted to make sure everything was safe."  *Id.* ¶¶ 55–56.

Drummond asked Reyes why he had been videorecording; Reyes responded that he was "an independent journalist gathering content for a story" and "the longer I am in [handcuffs], the longer you guys are violating my rights." *Id.* ¶ 58. Drummond then had Reyes released from handcuffs. *Id.* ¶¶ 56, 59. Reyes stated that he wanted to file a formal complaint against Lavoie with internal affairs and with Drummond. *Id.* ¶ 60. Drummond directed Reyes to the professional standards unit of the State Police. *Id.* ¶ 61. Reyes began videorecording again. *Id.* ¶ 65.

That same day, Reyes visited the Connecticut State Police headquarters to file a complaint against Lavoie and chose to film this process. *Id.* ¶ 67. Upon his arrival, he first spoke with Officer Costello outside of the building. *Id.* ¶ 68. Costello gave him an Internal Affairs form to fill out, discussed Reyes's encounter with Lavoie at the airport, and invited Reyes to discuss that incident further inside the station, though he stated that Reyes could not film inside the headquarters. *Id.* When Reyes asked about this restriction, Costello stated "I'm not a hundred percent sure, but I know you cannot film inside because it is state property." *Id.* Reyes "agreed to follow Officer Costello's instruction to not go inside to film." *Id.* He continued filming outside the building, and Costello went inside to fetch Sergeant Fahey to speak with him. *Id.* ¶¶ 68–71.

Fahey approached Reyes "with a scowl and curtly asked him, 'You videotaping me? I don't want to talk to you then. If you want to videotape me, I am not talking. If you want to talk to me like a man, then we can chat.'" *Id.* ¶ 72.

Reyes began to describe his complaints against Lavoie. *Id.* ¶¶ 73–74. Fahey then interrupted him, asking "how can I help you today with pistol permits." *Id.* ¶ 74. When Reyes said that this wasn't his purpose, and that he "need[ed] help with reporting a civil rights violation," Fahey stated that he is a supervisor of special licensing and firearms, and "'I can't help you with

your complaint today . . . .  You have your outlet.  You can call IA.  I can get you the number or you could go online.'"  *Id.* ¶¶ 75–76.

Reyes asked to speak with someone at the headquarters.  *Id.* ¶ 78.  Fahey stated that Internal Affairs was not located there and gave him the address and directions to that division.  *Id.* ¶¶ 78– 79.  When Reyes again asked to speak to someone, Fahey replied, "You can call IA or you can go there and speak to them if they have time to speak to you . . . .  We've given you several outlets. We want to entertain your complaint through the proper channels, through internal affairs."  *Id.* ¶ 79.

Reyes and Fahey then exchanged goodbyes, but neither departed.  *Id.* ¶¶ 80–81.  As Reyes apparently continued to film the interaction, Fahey asked several questions indicating that he expected Reyes to leave the premises: "Are you all set[?]"; "[S]o you can go to the IA right now, correct?"; and "[S]o you are just going to stand there with your cell phone out[?]" *Id.*  Reyes apparently continued filming and replied, "I thought you were busy.  You should get to work." *Id.* ¶ 81.  Fahey then approached again and stated, "I should get to work? Is that what you're telling me?" *Id.* ¶ 82.  Reyes said, "if you're busy." *Id.*  Fahey then "grabbed Mr. Reyes's cell phone that was in [his] right hand," but Reyes managed to hold onto the phone.  *Id.*  Fahey then "grabb[ed]" Reyes with one hand and grabbed his cell phone and took it from him, "causing the recording to stop." *Id.* ¶ 83.  Fahey then tossed the phone aside, damaging it.  *Id.*  Fahey grabbed Reyes's shirt and tried to push him to the parking lot, stating, "This is private property, you are not going to videotape me and have an attitude . . . .  I gave you everything you need but all you want to do is stand here and hold your cell phone in my face." *Id.* ¶¶ 84–86.  Fahey then instructed Reyes to make his complaint, and walked away. *Id.* ¶ 87.

Reyes thereafter requested to fetch his phone, and was told that an officer would bring it to him. *Id.* ¶ 87. He asked another police officer present at the altercation if the police were serious about wanting to arrest him; the officer confirmed interest in detaining him. *Id.* ¶ 88. Reyes then departed the area. *Id.*

Almost two years later, on June 16, 2023, Reyes returned to the same police headquarters building, with the intention of filing a FOIA request and obtaining Fahey's disciplinary record. *Id.* ¶ 89. When he arrived, he saw Fahey inside the building. *Id.* While Reyes was still outside, he was approached by a state trooper, to whom he explained his purpose for being there. *Id.* ¶ 90. Fahey then came to the door of the station, told Reyes that his request had to be in writing, allowed another person to enter, and told Reyes to "get out of the way." *Id.* ¶¶ 91–92. Fahey blocked Reyes from entering, telling him, "[y]ou can't come in the building, you have no business here," and forcibly closed the door, making "unwanted contact with Mr. Reyes." *Id.* ¶ 93. Reyes replied, "I know your inclination is to assault me, stop pushing me, I am trying to get into the building." *Id.* ¶ 94. Fahey then "grabbed" Reyes's phone, ending its recording, and placed it in Reyes's pocket. *Id.* ¶ 95. Thereafter, Fahey ordered Reyes to "back up before I arrest you," and "continued to yell and intimidate [Reyes] . . . within inches of [his] face." *Id.* ¶¶ 95–96. The confrontation ended with Fahey shutting the door. *Id.* ¶ 96. Subsequently, another trooper allowed Reyes inside the headquarters. *Id.* ¶ 99.

Reyes sues Defendants Lavoie and Fahey under 42 U.S.C. § 1983, claiming violations of his First and Fourth Amendment rights.[1] Defendants move to dismiss three counts: Count Four,[2] against Lavoie for violation of Reyes's First Amendment rights; and Counts Twelve and Thirteen,

---

[1] Reyes withdrew claims against Officer Matthew Costello. *See* ECF Nos. 41–42.
[2] Reyes has numbered two successive claims "Count 4." ECF No. 1 at 22–23. Because only the latter is at issue in this ruling, I will use the numbering provided in the Complaint.

both alleging First Amendment retaliation against Fahey related to the incidents in 2021 and 2023, respectively.  ECF No. 15.

## II.    <u>LEGAL STANDARD</u>

For a complaint to survive a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), it must "contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  A claim has facial plausibility when the factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  A plaintiff need not provide detailed factual allegations but must provide the grounds of its entitlement to relief beyond mere "labels and conclusions." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The Court is required to view the complaint liberally, accepting all factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor.  *Nicosia v. Amazon.com, Inc*., 834 F.3d 220, 230 (2d Cir. 2016).

When a qualified immunity defense is raised on a motion to dismiss, such a defense faces a "more stringent standard applicable to this procedural route[, as] the facts supporting the defense must appear on the face of the complaint." *Sabir v. Williams*, 52 F.4th 51, 64 (2d Cir. 2022).  The Second Circuit has indicated that this is a "formidable hurdle" for movants to clear "and is usually not successful." *Id.* (quotation marks and citation omitted).  Even so, "because qualified immunity protects officials not merely from liability but from litigation, . . . the issue should be resolved when possible on a motion to dismiss, 'before the commencement of discovery,' … to avoid subjecting public officials to time consuming and expensive discovery procedures." *Garcia v. Does*, 779 F.3d 84, 97 (2d Cir. 2015) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)).

III.    **DISCUSSION**

Reyes brings three claims against Defendants under § 1983 for violation of his First Amendment rights: (1) against Lavoie for turning off his phone recording at Bradley Airport (Count Four); (2) against Fahey for pushing and grabbing Reyes on July 23, 2021 in retaliation for Reyes's activity in filming Fahey outside of the Department of Emergency Services and Public Protection ("DESPP") headquarters (Count Twelve); and (3) against Fahey for stopping Reyes from filming him outside the DESPP headquarters on June 16, 2023 in retaliation for Reyes's 2021 filming activity, as well as for his stated intention of seeking Fahey's disciplinary record (Count Thirteen).  Defendants argue that these claims should be dismissed because in each case the officer is shielded by qualified immunity.  ECF No. 15 at 1.  I discuss each argument below.

### A.  **Qualified Immunity Standard**

"Qualified immunity shields government officials from claims for money damages unless a plaintiff adduces facts showing that (1) the official violated a statutory or constitutional right, and (2) the right was clearly established at the time of the challenged conduct."  *Mara v. Rilling*, 921 F.3d 48, 68 (2d Cir. 2019) (citations and quotation marks omitted).  These elements may be addressed in either order, and a negative finding on either is sufficient to grant qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts … should be permitted to exercise their sound discretion in deciding which of the two prongs … should be addressed first"); *Mara*, 921 F.3d at 68 ("a court that decides this second question in a defendant's favor may award qualified immunity without conclusively answering the first.").

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Ashcroft v. al-Kidd*, 563 U.S.

9

731, 741 (2011) (quotation marks and citation omitted). The Supreme Court has repeatedly indicated that "clearly established law" may not be defined at a "high level of generality" but must be "particularized to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017) (citing *al-Kidd*, 563 U.S. at 742); *see also District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) ("The 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted. This requires a high degree of specificity." (internal quotation marks and citation omitted)). This means that a district court must "identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated [the asserted constitutional right at issue]." *White*, 580 U.S. at 79. "Public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases. If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Rivera v. Foley*, No. 3:14-CV-00196 VLB, 2015 WL 1296258, at *7 (D. Conn. Mar. 23, 2015) (quoting *Williamson v. Mills,* 65 F.3d 155, 157 (11th Cir. 1995)).

Here, the question is thus whether there were, at the time of the events alleged in the complaint, controlling court decisions holding that officers acting under similar circumstances violated the First Amendment. *See White*, 580 U.S. at 80 (finding that the Tenth Circuit improperly relied on caselaw that only established a supposed right at a general level, without sufficient correspondence to the facts of the case). Qualified immunity is a broad shield for police officers; it protects "all [officers] but the plainly incompetent or those who knowingly violate the law." *Id.* at 79.

In this court, "[o]rdinarily, for a federal right to be clearly established," "it must have been previously recognized by the Second Circuit or the Supreme Court." *Massimino v. Benoit*, No. 3:21-CV-01132 (RNC), 2025 WL 975177, at \*1 (D. Conn. Mar. 31, 2025). Even in the absence of controlling precedent, however, a right may be considered clearly established when there is a "robust consensus of cases of persuasive authority," *al-Kidd*, 563 U.S. at 731 (internal quotation marks omitted), or where "preexisting law clearly foreshadows a particular ruling on the issue," *Garcia*, 779 F.3d at 92 (internal quotation marks omitted). Where courts are split, however, officers "cannot [be] expected to predict the future course of constitutional law . . . [and] it is unfair to subject police to money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U.S. 603, 617–18 (1999) (quotation marks and citation omitted).

Reyes alleges that Lavoie and Fahey violated two clearly established First Amendment rights: the right to film public officials in public spaces (Count Four, filming at Bradley Airport, and Counts Twelve and Thirteen, filming Fahey in front of the DESPP headquarters) and the right to make a public records request. Defendants argue that controlling precedent has not clearly established a First Amendment right to film at either an airport security checkpoint or a police headquarters, or to make a public records request. Thus, they argue, Defendants' actions in preventing Reyes from exercising these supposed rights are protected by qualified immunity. As explained below, I agree with the Defendants as to Count Four; any First Amendment right to film the TSA screening checkpoint was not clearly established at the time of incident. As to Counts Twelve and Thirteen, however, I find that Reyes has pled sufficient facts to overcome the assertion of qualified immunity at this stage.

**B.  Count Four: Recording Lavoie at Bradley Airport**

In determining whether a constitutional right was clearly established at the time of the challenged conduct, my first task is to define the right at issue.  Here, Reyes alleges that Lavoie prevented him from filming a security checkpoint at Bradley Airport when, while placing Reyes in handcuffs, the trooper turned off Reyes's phone recording.  ECF No. 1 ¶ 125.  The Defendants argue that Lavoie is entitled to qualified immunity because there is no clearly established First Amendment right to film at an airport security checkpoint.  ECF No. 15-1 at 9–11.  Reyes, on the other hand, defines the right more broadly, arguing that "the First Amendment protects recording of police officers and government officials in public spaces."  ECF No. 27 at 4.  For the purposes of the qualified immunity inquiry, the Defendants' definition is correct.

As noted, the contours of a right may not be defined at a "high level of generality" but must be "particularized to the facts of the case."  *White*, 580 U.S. at 79.  Although Reyes is correct that an analogous ruling need not be "directly on point," ECF No. 27 at 4, casting the right as one to record public officials "in public spaces" violates the command that the right be particularized to the facts of the case.  What are "public spaces"?  Do they include any space the public can access during normal business hours, such as the interior of a mall or the lobby of a commercial office building?  Or are they limited to publicly accessible spaces owned by the government, which would include everything from a post office lobby to the land surrounding a military base to the inside of a courtroom to the visiting area of a prison?  Or are they limited more narrowly to streets, parks, and outdoor plazas—spaces that courts have considered "traditional public fora" in First Amendment cases?  Reyes's generalized formulation of the right at issue offers no answers to such questions, and Reyes does not explain why a court should expect a police officer to know the answers.  The Supreme Court plainly does not expect them to; it requires that officers know only

12

those rules of constitutional law that make "clear to a reasonable officer that his conduct was unlawful in the *situation he confronted*"—as defined with a "high degree of specificity." *Wesby*, 583 U.S. at 63 (emphasis added). And in the only reported federal court of appeals decision involving an attempt to video-record a TSA security checkpoint at an airport, the Tenth Circuit made clear that "public space" was too broad a formulation to use in a qualified immunity analysis: "[E]ven if we agreed there is a First Amendment right to record law enforcement officers in *public*, we would still need to determine whether that conduct is protected at an airport security checkpoint." *Mocek v. City of Albuquerque*, 813 F.3d 912, 931 (10th Cir. 2015) (emphasis in original).

So a narrower formulation is needed here. Specifically, to "identify a case where an officer [was] acting under similar circumstances" as Lavoie, *see White*, 580 U.S. at 79, I must find one in which an officer stopped someone from video recording an airport security checkpoint or, perhaps, some similar location like a security checkpoint at a prison or courthouse entrance. Neither party points to, and I have been unable to find, any such case from the Supreme Court or Second Circuit. And the closest case on the facts from *any* court—*Mocek*, which arose from an incident at the Albuquerque airport—goes against Reyes, finding that there is no First Amendment right to film a TSA screening checkpoint, let alone a "clearly established" one. *Mocek v. City of Albuquerque*, 3 F. Supp. 3d 1002 (D.N.M. 2014), *aff'd*, 813 F.3d 912 (10th Cir. 2015). There, police officers arrested the plaintiff after he refused to stop filming the checkpoint and refused to provide ID. *Id.* at 1014–15. In deciding that the First Amendment did not protect the plaintiff in this context, the district court relied in part on *International Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992) ("*ISKCON*"), in which the Supreme Court rejected a First Amendment challenge to a regulation barring solicitation of money within airport terminals brought by a

13

religious organization whose members solicited funds and distributed literature as part of their religious practice.  In *ISKCON*, the Supreme Court found airport terminals not to be traditional public fora, i.e., "government property that has traditionally been available for public expression." 505 U.S. at 678.  Following that rationale, the district court in *Mocek* likewise concluded that TSA screening checkpoints are not public fora.  3 F. Supp. 3d at 1071 ("Rather than the free expression of ideas, the primary purpose of a screening checkpoint is the facilitation of passenger safety on commercial airline flights, and the safety of buildings and of the people for whom a plane can become a dangerous weapon[]."). The court went on to conclude that the officers' stopping of the recording satisfied the relaxed standard of "reasonableness" applicable to restrictions on First Amendment–type activity in nonpublic fora.  *Id.* at 1072 (finding officers' actions reasonable because "filming screening procedures could have a disruptive effect, because the TSA agents at the checkpoint must determine whether the filming is being done for legitimate or illicit purposes," and because the filming "diverted the attention of TSA agents, who could have assisted other passengers who had forgotten their identification" and "could thus have resulted in delays to other passengers"). On appeal, the Tenth Circuit affirmed without reaching the First Amendment issue decided by the district court, but, as noted above, the court commented that, to undertake a qualified immunity analysis, it would "still need to determine whether [the plaintiff's] conduct [of video-recording] is protected at an airport security checkpoint," not just "in *public*."  *Mocek*, 813 F.3d at 931 (emphasis in original).

The only other airport case involving video-recording I have been able to find does not help Reyes either, because while the district court agreed with his position, the Court of Appeals reversed, finding that the plaintiff had no cause of action at all.  *Dyer v. Smith*, No. 3:19-cv-921, 2021 WL 694811 (E.D. Va. Feb. 23, 2021), *rev'd and remanded with instructions to dismiss*, 56

F.4th 271, 281 (4th Cir. 2022). The case involved slightly different but still similar facts: TSA agents stopped the plaintiff from recording a pat-down search of his husband and ordered him to delete the video he had already taken. Recognizing a novel *Bivens* remedy against the TSA agents, the court went on to reject the defendants' qualified immunity defense, finding that there was a First Amendment right "to record government officials performing their jobs" and that this right was "clearly established" by the same decisions of federal courts of appeal on which Reyes relies here. 2021 WL 694811 *7-8.[3] But the Fourth Circuit reversed, finding that it was improper to recognize a *Bivens* remedy in this context, noting, among other things, national security considerations that might arise from recognition of such a cause of action, including that it might make TSA agents hesitant to make split-second decisions about suspicious passengers.

Even had the Fourth Circuit affirmed, however, *Dyer* would not be persuasive authority, because the district court made the same mistake Reyes does in defining the right at too high a level of generality. Taken literally, the *Dyer* district court's formulation that there is a First Amendment right "to record government officials performing their jobs" would extend even beyond "public spaces" to locales like the White House situation room or a Cabinet official's office. *See Massimino*, 2025 WL 975177 *2 (framing the asserted First Amendment right "broadly as the 'right to record the police' . . . does not provide the degree of particularity required by the Supreme Court to find that the right is 'clearly established.'"). And the federal court of appeals decisions on which the *Dyer* district court and Reyes both rely neither involve airports or security

---

[3] The *Dyer* district court also relied on *Tobey v. Jones*, 706 F.3d 379, 391 (4th Cir. 2013), a case involving an airport passenger who was arrested by TSA agents and police "for displaying the text of the Fourth Amendment to the United States Constitution on his chest." *Id.* at 382. Apart from the fact that it happened at an airport, the case is far afield factually: it did not involve any attempt to film or otherwise record at the airport and plainly concerned expressive activity, rather than news-gathering—a distinction Reyes emphasizes in his brief. *See* ECF No. 27 at 4.

checkpoints nor recognize a right of the breadth that Reyes asserts.  Most of them involve persons trying to record police officers during vehicle stops, arrests, and public protests on public streets and in public parks, all of which are traditional public fora in which the government's ability to restrict First Amendment–protected activity has long been sharply limited.  *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) (plaintiff arrested for using cell phone to film police who were arresting an individual on the Boston Common); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (plaintiff who was attempting to videotape "a public protest march" arrested while trying to record "sidewalk bystanders"); *ACLU v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) (sustaining pre-enforcement First Amendment challenge to Illinois wire-tapping statute by ACLU, which sought to engage in "audiovisual recording of policing at expressive activity events—protests and demonstrations—in public fora in and around the Chicago area").  One case involved an attempt to record police activity at the Philadelphia Convention Center and on a public sidewalk.  *Fields v. City of Philadelphia*, 862 F.3d 353, 356 (3d Cir. 2017).  Another involved a person who was recording a police station from a public sidewalk across the street.  *Turner v. Driver*, 848 F.3d 678, 688 (5th Cir. 2017). *See generally Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) ("For the state to enforce a content-based exclusion [in a traditional public forum] it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.").[4]  While these cases, as I conclude below, do represent a "robust consensus" of persuasive authority that there is a First Amendment right to record the police while

---

[4] The *Smith* case, which Reyes also cites, is a brief opinion that does not describe the factual circumstances in which the police allegedly "prevented [the plaintiff] from videotaping [their] actions," an allegation the Eleventh Circuit found the plaintiff failed to prove. *See Smith v. City of Cumming*, 212 F.3d 1332 (11th Cir. 2000).

on streets, sidewalks, parks, and similar venues, they do not show that there is a clearly established right to film either TSA officials or the police at an airport security checkpoint.

Reyes argues that forum analysis is not appropriate because it applies only to speech restrictions and not to the right to record public officials.[5]  This argument misses the central point of the qualified immunity inquiry, i.e., whether the right the plaintiff is asserting was, at the time of his interaction with the police, "so well defined that it [would have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted," a situation that must be defined with "a high degree of specificity."  *Wesby*, 583 U.S. at 63.  Regardless of whether forum analysis should apply to the question whether Reyes had a First Amendment right to video-record the TSA security checkpoint, the question whether Lavoie has qualified immunity for his actions requires attention to the details of the situation he confronted, which include the characteristics of the place where the interaction took place.  One of those characteristics is, obviously, that a security screening checkpoint inside an airport is likely to be considered by many, including many police officers, to be a more sensitive location than a public sidewalk or a park because it involves ensuring the safety of the flying public, and that it is not a place many officers would recognize as

---

[5] For this proposition, Reyes cites a recent district court decision in another case he brought, where the court decided not to apply forum analysis to his attempts to video-record activity inside a police precinct.  *Reyes v. City of New York*, No. 23-CV-6369 (JGLC), 2024 WL 4354877 *5 (S.D.N.Y. Sept. 30, 2024) (declining, on motion to dismiss, to apply forum analysis to "the right to record police in public performing their official duties" but acknowledging that there was a Circuit split on whether analysis of news-gathering should follow forum framework).  Of course, that case, even if it could have laid down "clearly established" law, would not have been available to Lavoie in 2021, when he stopped Reyes from recording.  Further, earlier in the same case, the same judge did apply forum analysis in finding that Reyes had failed to show a likelihood of success on the merits on his First Amendment claim in connection with his motion for a preliminary injunction.  *Reyes*, 2023 WL 7212192, at *6–*8 (S.D.N.Y. Nov. 2, 2023).  As I have shown, the court in *Mocek* also applied forum analysis to the plaintiff's First Amendment claim arising at the Albuquerque airport.

being traditionally available for, or dedicated to, any First Amendment–protected activity, be it speech or news-gathering.

Finally, Reyes points to his allegations that the TSA website expressly allowed video-recording at the airport and that he received specific permission from a TSA supervisor to record the area. While those circumstances, if proven, may provide support for his Fourth Amendment claim, they do not help his First Amendment claim and, more importantly, they have no bearing on whether any First Amendment right to record at an airport was "clearly established" in 2021. Only courts, and in particular the Supreme Court and (here) the Second Circuit, can "clearly establish" a constitutional right; executive branch officials cannot do so. *Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). Executive branch policies do not "clearly establish" the law any more than state statutes do. *J.H. v. Bratton*, 248 F. Supp. 3d 401, 413 (E.D.N.Y. 2017) ("the existence of a police policy does not constitute clearly established law, nor does an officer's knowledge of the policy satisfy the 'objectively reasonable' belief test for purposes of denying qualified immunity"); *Tooly v. Schwaller*, 919 F.3d 165, 172 (2d Cir. 2019) ("a state statute does not serve as 'clearly established law' for purposes of qualified immunity").

Because there was no clearly established law recognizing a First Amendment right to video-record a TSA security checkpoint at an airport when Lavoie stopped Reyes from recording in 2021, I conclude that Lavoie has qualified immunity with respect to Reyes's First Amendment claim and grant the motion to dismiss Count Four.

### C.  Counts Twelve and Thirteen: Retaliation

Reyes also brings two First Amendment retaliation claims against Fahey under § 1983. "To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right protected by

the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).

The claims allege that Fahey retaliated against Reyes, on separate occasions, for his filming activity at the DESPP headquarters on July 23, 2021, which Reyes asserts was an exercise of his First Amendment right to record police officers performing their duties in public. Defendants argue that the right to film in lobbies of police headquarters is unsettled and so Fahey is entitled to qualified immunity. ECF No. 15-1 at 21. I find that dismissal is not warranted on these claims.

The Defendants' argument concerning a right to film in police station lobbies does not respond to the factual allegations of the complaint, which do not allege that Reyes filmed Fahey or any other officer *inside* the state police headquarters. According to the complaint, Reyes's filming activities all took place outside the building. *See* ECF No. 1 ¶ 68 (Reyes "agreed to follow Officer Costello's instruction to not go inside to film"); ¶ 69 ("Officer Costello and Mr. Reyes . . . discussed Mr. Reyes's allegation . . . *outside the building*"); *id.* ¶ 80 ("As [Fahey] was about to *walk back inside*, Sgt. Fahey then asked Mr. Reyes, "Are you all set here?""); *id.* ¶ 84 ("Sgt. Fahey . . . shoved [Reyes] several times . . . towards the parking lot"); *id.* ¶ 87 ("After he pushed Mr. Reyes to the front parking lot, Sgt. Fahey left and walked away"), *id.* ¶ 90 ("Mr. Reyes, *while outside the building*, was approached by a female trooper" to whom he stated that he was there to request Fahey's disciplinary record); *id.* ¶ 93 ("Sgt. Fahey physically blocked Mr. Reyes from getting into the building and told Mr. Reyes, 'You can't come into the building'"); *id.* ¶ 96 ("Sgt

Fahey then shut the door without permitt[ing] Mr. Reyes to go inside") (emphases added).  There are no factual allegations that suggest that Reyes filmed while inside the DESPP headquarters.[6]

When all inferences are drawn in Reyes's favor, the police conduct at issue here—for qualified immunity purposes—is similar to the conduct at issue in the federal court of appeals decisions Reyes cites and I discuss above.  As noted, those decisions recognize a First Amendment right to record police activity on public sidewalks, streets, parks, and other similar venues.  Indeed, the factual allegations in this case bring it very close to the Fifth Circuit case in which the court recognized a First Amendment right to film a police station from a public sidewalk across the street.  *Turner*, 848 F.3d at 688.  And there are no allegations suggesting that Reyes was trying to film non-public or sensitive areas of the DESPP headquarters while he was standing outside.  *Cf. Massimino*, 2025 WL 975177 *2 (granting summary judgment on qualified immunity grounds where plaintiff was filming from outside the police station but noting that"[t]he scope of plaintiff's videotaping . . . encompassed the entry to the offices of the Youth Division, where officers conduct victim interviews and process juveniles, who are entitled by statute to confidentiality" and other sensitive areas and "nonpublic spaces").  In fact, the thrust of his allegations is that he was filming officers—especially Fahey—while the officers were outside (or in the open doorway) of the building.

---

[6] Further, Reyes does not even clearly allege that he *sought* to film inside the building.  He does allege that he asked Costello why he could not film inside the building and that he "believed" he had a right to film inside, but he does not allege that he expressed that belief or objected to Costello's statement that he could not film inside.  To the contrary, he claims that he "agreed to follow" it.  ECF No. 1 ¶ 68.  In any event, he could not make any claim about being prevented from filming inside at this point because he has withdrawn his claims against Costello.  *See* ECF No. 41–42.  And while the complaint alleges that Fahey denied Reyes building access in 2023, it does not allege that Reyes attempted to film inside headquarters at that time.  *See* ECF No. 1 ¶¶ 89–90.

The complaint does not describe the parking lot or any walkways or front lawns at DESPP headquarters and does not indicate whether these areas are visible from the street. But at this stage, I must draw all inferences in Reyes's favor. And when I do so, this case is close enough to the factual scenarios in the court of appeals decisions discussed above, in which the courts recognized a First Amendment right to record police officers from the vantage point of public streets, parks, and sidewalks, that I cannot meaningfully distinguish it from those cases. It is possible that further factual development of the record will show that Reyes did, in fact, film while inside the building or that the DESPP headquarters includes outdoor features that make it different enough from a public street or sidewalk that qualified immunity should apply. But at the pleadings stage, Defendants have failed to show that the First Amendment right Reyes sought to exercise to film officers, and in particular Fahey, from outside the state police headquarters was not clearly established.

Defendants do not dispute that Fahey's actions in either 2021 or 2023 plausibly fulfill the second and third elements of a First Amendment retaliation claim, and I find that they do. In the 2021 incident, Fahey allegedly expressed immediate and repeated verbal hostility toward Reyes's filming activity, which escalated into physical aggression. This is sufficient evidence from which to infer that the filming motivated Fahey's subsequent hostile actions. As to the 2023 incident, Fahey began their exchange by blocking Reyes's access to the DESPP headquarters, stated that he should "get out of the way" and "could not come into the building," and soon after grabbed Reyes's phone to end his recording. ECF No. 1 ¶¶ 92–93, 95. Accepting these allegations as true, I can plausibly infer that Fahey bore ongoing animus toward Reyes stemming from their first confrontation, motivated ultimately by Reyes's 2021 filming activity.

As to the third element, Reyes pleads that Fahey's actions in pushing him, *id.* ¶¶ 84, 87 (2021), throwing his phone to the ground, *id.* ¶ 83 (2021), shouting at him, *id.* ¶ 96 (2023), and threatening him with arrest, *id.* ¶ 95 (2023), caused Reyes injury and mental anguish.  *Id.* ¶¶ 175, 181.  Based on the factual allegations in the complaint, I find these assertions to be plausible.  Reyes has therefore pled injuries to sustain his First Amendment retaliation claims.[7]

The Motion to Dismiss Counts Twelve and Thirteen is DENIED.

## IV.    **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED as to Count Four and DENIED as to Counts Twelve and Thirteen.

IT IS SO ORDERED.

                                                              /s/
                                                      Michael P. Shea, U.S.D.J.

Dated:  Hartford, Connecticut
            September 29, 2025

---

[7] Reyes also asserts in Count Thirteen that Fahey's actions on June 16, 2023, were in retaliation for his stated intention to file a FOIA request seeking Fahey's disciplinary record.  ECF No. 1 ¶ 179.  Because I find this count can proceed based on Fahey's alleged retaliation for Reyes's 2021 filming activity, I need not consider the First Amendment-protected status of FOIA requests here.